Last case. American Builders Insurance v. Southern-Owners Insurance. Ms. Gooden. Good morning. Kansas Gooden on behalf of Southern-Owners. This court should reverse and remand either for entry of judgment in favor of Southern-Owners or alternately for a new trial. The record shows that Southern-Owners did not have a reasonable opportunity to settle Mr. Guthrie's claim. Payment of Southern-Owners limits would not have settled Mr. Guthrie's claim against Beck Construction. Mr. Guthrie never requested and expressly disclaimed Southern-Owners limits. In fact, his attorney, Mr. Cohen, conditioned settlement on the Evanston policy and the American Builders policy. And so settlement could only be had by payment of those... Your theory is that Guthrie wanted so ardently to be paid a million dollars by American Builders, he would have rejected the same payment if offered by Southern-Owners. Is that right? And how can you say that the record supports that? Well, it appears that he didn't believe there was coverage. And if you look back at his deposition, he knew about the Southern-Owners policy. That's not really my question, is it? So your contention is he would have rejected a million dollars if it had been offered by Southern-Owners? Surely not. It wouldn't have met the demand, though. And that's the thing. It wouldn't have met the terms of the demand. Whether he would have did a side deal, that's a whole other thing. But it would not have met the terms of his demand. And the express terms of his demand did not involve Southern-Owners. If the jury could have reasonably concluded that he would have accepted that settlement, right? That's a problem for you, isn't it? I don't believe so. And the reason why is if you look at actually what Southern-Owners learned about that demand. The demand is November 18th. Southern-Owners found out about it at 10.30 a.m. on the date it was due. And they verbally found out about it. That's less than 24 hours to pay a million dollars. That is absolutely unreasonable. And the 4th DCA and the Delain versus Liberty Mutual said a 10-day demand is totally unreasonable. So how can less than 24 hours be considered reasonable? And that really is our position. And they didn't even receive a copy of that demand. I'm sorry, didn't they have an affirmative duty to settle this when they knew that there was a demand for $2 million? And that the liability was likely to exceed that if the $2 million were not paid? So under PAL, you do have an affirmative duty when liability is clear and damages are going to exceed the policy limit. However, I don't think liability was clear. And if you look at Southern-Owners and their statement that they obtained from Mr. Beck who owns Beck Construction, there are a lot of conflicting statements as to what exactly happened, what Beck told. Let me ask you this. Your client also did not provide a defense or offer a defense. I mean, to Beck, did it? Well, there was no lawsuit to defend at that point. But it did nothing. I mean, it really did nothing. It knew there was this outstanding $2 million demand. And it reached no conclusions over all of those months. It just did nothing. So we disagree with that, Your Honor, because number one, it didn't know about the $2 million demand until the day it was due. It was aware of a demand from September, dated September 5th, that was $1 million for Beck Construction. Let me ask you a question. When, for the first time, did Southern learn that the accident caused Guthrie to be rendered paraplegic and the medical bill succeeded $400,000? So they received notice of the claim on September 12th, and that was five months post-accident. And that was they received the demand letter. Now, even though they received a demand letter, they didn't receive the medical records. And it wasn't until later in September, I believe the September 27th or 28th, they received medical records from Mr. Cohen. And at that point, they knew that the damage – So they knew this was a grievous injury. And they knew that, assuming liability, the damages payment would be extraordinarily high, whether it came out of Jones' pocket or Smith's pocket, didn't much matter. They knew they had a man who fell off a roof working, and he was very, very seriously injured. So no question about that. Correct. You were put on notice about that long, long before this – at a very early point in your involvement in the case. That would be fair, would it not?  Okay, so the only real question was the question of liability. And coverage. Right. But with regard to the question of liability, as I read this record, Southern Owners didn't reach out to Beck Construction's lawyer until several weeks into October the 18th. And when they finally got in touch with Beck, it was delayed even more. And then finally, when you spoke to Beck and he told you their view of what had happened, it took too long because you said, well, we've got to speak to a couple of other people too. Is that basically the essence of what happened here? Correct. The first request to Beck was October 18th. And there were several requests over the course of the next month, and they finally obtained the statement on December 10th. And I also want to bring up the coverage issue. So not only were they investigating liability, they were investigating coverage. And why was that important is there was an endorsement on this policy for employer liability. And my trial counsel alerted the trial court in its summary judgment of two cases, Evanston from this court, which was unpublished, and then Taylor, which basically copied and pasted the full Evanston opinion as its reasoning. And we distinguished those because it didn't involve an endorsement. Well, why is that important? Very basic insurance law in Florida basically says that when an endorsement is inconsistent with the body of the policy, the endorsement controls. When there's any ambiguity between the body of the policy and the endorsement, the endorsement controls. So here we have an intent from the parties to change the insured to any insured, and it reflected that intent to expand the exclusion. Any insured is much different than the insured. Any means every and all. The word the is a definitive article, and it means basically a specified person or one. Can I ask you a question? What difference is there between the insurance policy here and the one in Taylor? Weren't they identical? Other than the endorsement, and that's the key thing. The Taylor policy did contain the language any insured, but it's the fact of the endorsement. And I think this endorsement changed more than just the words of, say, the exclusion, because it changed the effect of the full policy, including the severability of the insured, because all of a sudden there was ambiguity, there was different intent, and under basic Florida law, that endorsement controls here. And so, again, my client was investigating liability, they were investigating coverage, because the fact of this being through an endorsement makes it different than Taylor and Evanston. I'm sorry. I don't understand why it makes it different. Because it shows an intent to amend the policy. And kind of basic contract law is contracts have to be interpreted on the intent of the parties. And so, because there is that basically conflict there between the severability provision and the endorsement, so the endorsement is going to control, and the endorsement's intent should control. The other thing, too, that I think is important for this case is southern owner's actions didn't cause American Builders to pay more than it already owed. American Builders made the decision to tender their limits at the earliest point. Okay, here's the issue. Your client is the primary insurer, is that right? Correct. Unless there's no coverage, and that's where we get into the coverage. I understand. But if there's coverage, your client is the primary insurer. Correct. Evanston had already decided it was paying no matter what, right? Correct. And in this case, the plaintiff decided, Guthrie decided, he wanted $2 million. So that leaves $1 million left to be paid. That was to be paid by the primary insurer, assuming liability and coverage. That was to be paid by the primary insurer, not the secondary insurer, right? Wouldn't that have been your client's responsibility? Not by the express terms of that settlement demand. And if you look back to Mr. Okay, but wait a second. That's not what I'm asking. I'm asking under the terms of your being a primary insurer, wouldn't that have been your client's responsibility? As primary insurer, they would be, number one, if their policy provided coverage. Right. And in this case, it was a total of $2 million that is sought. We already know $1 million is coming from somewhere, and American Builders winds up asking you to pay the money, and you don't pay the money. So they say they have to pay the money, because otherwise there's going to be a bad faith problem down the line. Why is the jury verdict that this was involuntarily paid by them not appropriate? Well, a few things. Number one is the notice of this $2 million demand. They gave them less than 24 hours to pay. The other problem is it's ignoring the express terms. But, again, I mean, your client had known about this for months, right, and had procrastinated effectively. I mean, there was a point, I think, when you waited until two days before to go ahead and interview employees. I mean, two days before the last day in December, I guess, for doing that. You know, why didn't that force builders to have to make the payment instead? I mean, you can certainly investigate these things, obviously, but at some point you have to make a determination. Do you not? I agree that a determination needs to be made, but American Builders had already made that determination over a month before, actually two months before any of that even occurred. They made that determination at earliest October 14, 2019, and there is a letter from Mr. McIntosh to Mr. Cohen stating that American Builders is basically ready, willing, and able to send it its million dollars. So nothing that happened the two months after that caused American Builders at that point to change its position. It was going to do it anyway. It did not do it, though, because it asked you to do it. I mean, we don't focus on what builders did. We focus on what the insurer is supposed to do. That's what Florida case law tells us. That's where we're supposed to focus. So I'm not getting how it helps you that American Builders was willing to fulfill its duty if you were not. Well, you do focus on them to an extent because it's the totality of the circumstances, and that's where it comes in. It sounds like a jury question. Which, Your Honor, bad faith often is, but we are asking, again, for a judgment in favor of Southern owners, and I will reserve the rest of my time for rebuttal. Okay, you've saved four minutes. Mr. Burlington? May it please the Court, I am Phillip Burlington here on behalf of American Builders Insurance Company. With me at counsel table is Richard Ben-Ruby, who is trial counsel. I have a hearing impairment. My phone is connected to my hearing aids. If I go to my phone, I'm not texting somebody. I'm adjusting it, but I don't think I'll have to. Their position that they had no reasonable opportunity to settle the claim is directly inconsistent with the testimony of their corporate representative, Mr. Blaser, who testified at page 66, which is in Appendix 2, Part B, that it was not Southern owners' position that it had no opportunity to settle the claim within its policy limits. Furthermore, as to the issue of whether Guthrie would accept the million dollars from Southern as opposed to American Builders, Mr. McIntosh, who was the attorney for American Builders, testified that Mr. Cohen told him he didn't care where the million dollars came from, and that's at page 258 of Mr. McIntosh's testimony. And I should add that that position makes complete common sense. Now, the issue of the 24 hours, they had notice of the September 5th demand for $1 million. From September 12th, more than three months, they took no action to affirmatively involve themselves in settlement negotiations except to repeatedly ask for extensions. And the only extension grounds was, well, we haven't spoken to Mr. Beck. Well, they didn't contact Mr. Beck's attorney, who, by the way, was being paid for by my client, who was providing a defense, until five weeks after they had notice of the demand. And when they used the fact that my counsel expressed to Mr. Cohen that American Builders had made a decision to tender in October 14th, which was more than 30 days after the initial demand, that was part of negotiations to obtain further extensions and show good faith and make it clear that, in addition to that, there was an excess policy available, and the initial demand did not consider that, and that our client, if they tendered, would not get a full release, and they had to negotiate it. So that was an offer to tender, and we all know there's a distinction between offering to tender and the actual tender, which did not occur until September, excuse me, December 19th, after my client obtained a 24-hour extension, after my client's attorney had a phone call with Southern Owner's attorney and explained the situation and what was going on and was told unequivocally that Southern would not be paying the million dollars. It had not determined coverage. It had made the decision to provide a defense, but had done nothing to implement that. At that point, it was crystal clear that, in the interest of Beck's construction, the only thing my client could do to protect them was to pay that $1 million, and they did so. But as a causation issue, it clearly was relevant, and the jury could consider that Southern Owner's knew of the million-dollar offer for three months, did nothing, and had really engaged in a pretextual investigation, doing nothing more than getting documents that were the same documents that my client had and then basically trying to make it look as though they were doing things when they weren't. And I would note that the judge who presided over the trial at the end of the evidence in the context of the motions for judgment as a matter of law said, this is at page 96, however, there's also testimony that would seem to me that a reasonable jury could conclude that Southern unreasonably withheld consent or didn't properly investigate the case or really just sort of played builders along to force builders into paying the $1 million for them. And I do not need to persuade you that that's the only reasonable analysis of the evidence. I would suggest it is, but it is a reasonable analysis of the evidence that this jury could reach based on the jury instructions. And I should also add that in the order denying cross motions for summary judgment, Judge Middlebrooks made the point that the bad faith would turn on whether or not Southern, in the three months that it was aware of the offer, whether they should have settled Mr. Guthrie's claim in advance of or by December 18th, 2019, that it was a question best suited for a jury after weighing the evidence and all credibility determinations. And we know that bad faith is ultimately determined on the totality of the circumstances and therefore trying to pick out one aspect of a factual situation and make it into the determinative fact for purposes of bad faith is very risky and frankly, almost always erroneous. So here, the 24-hour period is not relevant. The jury could have considered it, but it's not relevant to whether they did anything in the preceding three months, which is when they had the opportunity to defend their insured. On the separation of insured's provision, usually known as a severability provision, Southern did not argue below that there was any ambiguity. They argued that as a matter of law, that since Mr. Guthrie was employed by Ernest Guthrie LLC, that therefore that barred any coverage. And as the many cases on these type of provisions where there is a separation of insured or severability clause states that when you are analyzing an issue such as that, it is determined by who is the insured who is seeking a defense or liability coverage. In this case, indisputably, that was Beck's construction. There is no evidence suggesting that Guthrie was employed by Beck's construction. And in fact, of course, his LLC had obtained the policy from Southern and they were aware of his relationship to that LLC. There was a comment made by Mr. Blazer at some point in an email that at the time of the payment in December 18th, that they were still looking into whether or not Mr. Guthrie was an employee of Beck's. There is no evidence in the record they ever requested anything. He said they requested documents and hadn't received them. The record contains the four document requests that Southern sent to Beck's counsel and Beck's attorney and to my client asking for documents. None of the documents had to do with Guthrie's employment. There is no evidence they didn't get everything they wanted. Mr. Cohen testified he provided everything to them. So this was just another aspect of the pretextual investigation, trying to make it look as though they were doing something which put my client, American Builders, under the gun because Mr. Cohen, who at his video deposition, which was shown to the jury, testified he'd never looked at the Southern insurance policy. He had decided that American Builders is the one that he should be sending the demand to. And it was very obvious to him that American Builders was the only one who was actively engaging in settlement negotiations. But that did not mean that Southern owners' conduct was not the cause of my client's payment. As indicated by Judge Middlebrooks, Southern owners should have acted long before December 18th if they were properly defending Beck's and trying to resolve the case and the jury could reasonably conclude that they had not. And so under these circumstances, the causation really shouldn't be an issue. The jury instruction, which has not been challenged, said that all that was necessary was that the defendant's conduct be a contributing cause and it didn't have to be the only cause. I would submit that it was the only cause, but even if it wasn't, it was clearly a cause due to their failure to step up and provide the defense and settlement discussions on behalf of their client. And therefore, I believe that there's no need for a new trial and that the judgment below should be affirmed. Thank you. Thank you, Mr. Burlington. It's good in your four minutes. Yes, Your Honor. Just a few points. Again, with regards to the exclusion, all the cases that are on this exclusion do not involve endorsements, and that's why we think our case is different, and it's just because of how endorsements are treated under Florida law. There's also been a few comments about we didn't defend or that was not pled below, and Judge Middlebrooks specifically addressed that in the cross-order of MSJ because it was not pled. The problem with your endorsement argument is you're complaining about the denial of a motion for summary judgment. The case went to trial. You can't appeal the denial of a motion for summary judgment after the case goes to trial and reaches a verdict. Well, Your Honor, I disagree because that does not fall under the Ortiz and Johnson progeny. It was an issue of law involving interpretation of insurance policy. Here's a quote from a president of our court this year. A party may not appeal an order denying summary judgment after there has been a full trial on the merits. End quote. I understand, Your Honor, but the coverage issue was not actually tried because it was just a pure legal issue. The trial specifically dealt with bad faith over the objection of Southern owners. Only one question went to the jury, and that was specifically on bad faith. So it is our position that we should be able to have the ability to raise this coverage issue. Number two, with regards to- Wasn't that necessarily embedded in the judgment of the jury here and the final judgment entered by the district court? I don't think so, and the reason why is because a jury cannot make basically a question of law conclusion. This was not a factual issue concerning this exclusion. It was a question of law as to the interplay between different- It would be one thing if your argument was we're entitled to a judgment as a matter of law at the end of trial, and this is the basis for the argument, versus an argument that it was error for the district court to deny summary judgment, which is the way you have framed it. Correct, Your Honor. And the problem for you is you can't do that after it's been tried. I understand. So the other criticism is that Southern owners did not take any action, and that is not true. Immediately when they got notice, Southern owners hired counsel. Counsel sent out numerous requests for information from Cohen to American Builders to Beck, and I think this all needs to keep in mind, they received notice of this accident five months after the accident and four months after American Builders had notice of this incident. Mr. Blaser testified that he contacted Cohen and requested information. He did an OSHA search himself. So this is not a case that the insurance company just didn't do anything. They were actively trying to get information from relevant parties. So for these reasons, Your Honor, we request this court to reverse and remand for entry of judgment in favor of Southern owners or alternatively a new trial. Thank you. Thank you. We'll be in recess until tomorrow.